# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
Assigned on Briefs December 4, 2007

## STATE OF TENNESSEE v. CAMERON WINSELLE

**Direct Appeal from the Criminal Court for Shelby County**
**No. 04-05193     Lee V. Coffee, Judge**

_____

**No. W2007-00139-CCA-R3-CD  - Filed February 20, 2008**

_____

A Shelby County jury found the Defendant, Cameron Winselle, guilty of two counts of first degree murder, and the trial court sentenced him to two consecutive life sentences.  On appeal, the Defendant claims the evidence does not sufficiently support his convictions.  Finding no error, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and DAVID G. HAYES, J., joined.

Garland Ergüden (on appeal), Memphis, Tennessee; Sanjeev Memula and Glenda Adams (at trial), Memphis, Tennessee, for the Appellant, Cameron Winselle.

Robert E. Cooper, Jr., Attorney General and Reporter; Michael E. Moore, Solicitor General; J. Ross Dyer, Senior Counsel; William L. Gibbons, District Attorney General; Betsy Carnesale and Nichole Germain, Assistant District Attorneys General, for the Appellee, State of Tennessee.

## OPINION
### I.  Facts

On Sunday, August 11, 2002, brothers Rubin and Larry Matthews were shot and killed at their apartment complex in Memphis, Tennessee.  At the Defendant's trial for these murders, the following evidence was presented: Ruthie Matthews, the victims' mother, testified that the victims lived together and that she last talked to Larry the morning he was shot.[1]  Ms. Matthews, who found out about the shooting while she was still at Sunday's church service, said Larry was killed instantly,

_____

[1] The victims and some of the witnesses share a surname.  Therefore, for clarity, we have chosen to use their first names.  We mean no disrespect to these individuals.

but Rubin lived until Wednesday, August 14, 2002. Addressing her sons' living situation, she said Rubin lived with Larry to "protect him" because people would "come [into Larry's apartment] and eat up the food and [use] dope." On cross-examination, Ms. Matthews stated she talked to Rubin every other day. She testified that she did not know Rubin and Larry were drug addicts, but she knew Larry was diagnosed with schizophrenia.

Bland Matthews, the victims' brother, testified he last saw his brothers the Friday before their death. He visited them daily at their apartment because "there [were] always a lot of people preying upon them, taking advantage and coming into their apartment and illegal activity, or doing things that were not right." Bland continued, saying, "I was aware that there was a lot of activity with trying to sell drugs and just that [the people who visited] would bring stolen merchandise, just anything that they could do, because they could run over Larry and Rubin." Bland said both Rubin and Larry were over fifty years old, and Larry was diagnosed with paranoid schizophrenia. He testified he did not know if Rubin and Larry used drugs but said he "may have suspected it." On cross-examination, Bland testified that, when he visited his brothers' apartment in the past, there were a lot people coming to the door, and sometimes there were too many people in the apartment for Bland to "try to throw out of the home." He said Rubin and Larry had similar problems with people taking advantage of their apartment at other apartment complexes; Bland blamed Larry's mental illness for his letting people take advantage of him. According to Bland, "Rubin was physically unable to protect himself" against the people who would force their way into the apartment. He also said that he, Rubin, and Larry had all called the police several times for help expelling the people from their apartment. On re-direct examination, Bland further discussed what happened at the apartment, saying that people threatened Rubin and Larry with violence, promised them activities involving "certain girls . . . that were of a pretty base character," and did drugs. Additionally, Rubin was once "beaten pretty bad[ly]" by one of the people coming into his apartment, and he told Bland that he wanted to move. On re-cross examination, Bland testified that he did not know if Rubin or Larry were paid to let people use their apartment for drugs.

Gabriel Teal, the Defendant's ex-girlfriend and mother of his four-year-old daughter, testified that she accompanied the Defendant to the apartment complex on the morning of August 11, 2002. She said he was going to buy marijuana from a dealer named Torrick Lyles, whom the Defendant was meeting via Teal's connections, in an exchange that had been planned the previous day. Teal said she did not know how much money the Defendant had with him to buy the marijuana because he hid the money in a sock. She stated that she lived with the Defendant before and that she had seen "large" amounts of marijuana in the house; however, she never saw him buy or sell it. She also testified that she never saw him smoke marijuana, but she did see him with thousands of dollars at the house. She "understood [the Defendant] to be a drug dealer." Teal stated that on August 11, she and the Defendant drove to the apartment complex in his Lincoln Towncar, and he had a .38 caliber pistol, which he habitually carried, in his front pants pocket. She said he also had a gun in the Towncar's trunk, which he placed there that morning. Teal stated that, when they arrived at the apartment complex, she remained in the car while the Defendant went inside the building, carrying his sock full of money. She said the Defendant was in the apartment "two, or three minutes" before he "came back out to the car with his hands up." She said he told her "they" robbed him and that

he looked scared, but, instead of driving away, he opened the car's trunk, using a button on the driver's side interior, and he retrieved the gun. Teal testified that, as soon as the Defendant moved away from the trunk, she "got out of the car and ran" because she was "afraid." She said she heard "smaller shots and then . . . a big shot." Teal said the Defendant began calling her on her cell phone immediately after the shots wanting to know where she was, but she did not tell him because she was scared. He told her that he thought he "hurt somebody." Later, Teal talked with the Defendant, but she never asked him what he did with the gun from the trunk.

Teal testified that she originally heard about the victims' deaths from the police, who talked to her in December 2002. She admitted lying to the officers and telling them she was not at the apartment complex that day. She said she later talked to the police in August 2003 and was honest with them then about what she saw. Teal said that, after the incident at the apartment, the Defendant painted his black Towncar gold.

On cross-examination, Teal testified that she had lived with the Defendant for three years and that she had never gone on a drug deal with him before August 11, 2002. She said a man met the Defendant outside of the apartment and then led him inside, but she denied seeing anything else because she remained in the car. When she talked with the Defendant later on the phone, "He had like a rattle to his voice, you know, he sounded scared." On redirect, Teal stated that the Defendant never asked her to call the police when he came out from the house.

Rodney Davis, a brother of one of the victims' neighbors, testified that he bought Larry cigarettes. He stated that Larry "smoked drugs," and he let homeless people smoke drugs and sleep at his apartment. Davis recalled that on August 11, 2002, he heard a gunshot at the apartment complex. He said that his sister, whose apartment it was, told him that two men, one of them being Torrick Lyles, were at the door. The men stayed briefly in the apartment, and after they left Davis went back to bed.

Officer Terry Butler, a patrolman with the Memphis Police Department, testified that he responded to a call involving two male shooting victims. When he arrived on the scene, he found the victims lying in the rear bedroom of the apartment. Officer Butler said he taped off the scene with crime scene tape and gathered witnesses while he waited for the paramedics to work. On cross-examination, Officer Butler stated that Bland Matthews told him that his brothers were known drug users.

Officer James Fitzpatrick, a police officer with the Memphis Police Department, testified that he coordinated the crime scene for this case. He found shell casings in three locations: in the bedroom where the victims were shot; near the heating and air-conditioning units outside the victims' apartment; and in another apartment. Officer Fitzpatrick said the police developed the Defendant as the suspect as early as December 2002, but they could not locate him. Fitzpatrick stated the police used federal prisoner Torrick Lyles to find the Defendant. Teal, the Defendant's girlfriend, came forward and told the police that she accompanied the Defendant to the apartment complex for a drug deal, but he was robbed during the deal. She told them she fled the scene as soon

as she saw the Defendant reaching in the trunk for the gun. Officer Fitzpatrick said the police did not find weapons or other casings or bullets at the apartment, but they did find three casings belonging to the assault weapon outside the apartment, near the air conditioner. Additionally, the police found no evidence to support the use of a handgun. On cross-examination, Officer Fitzpatrick said that the police checked the parking lot, another apartment that was shot, and the victims' apartment for ammunition and casings.

Officer Kay Turnmire, an officer with the Memphis Police Department crime scene investigation unit, testified that when she arrived at the crime scene, both victims had been transported to a hospital for treatment. She testified that she did not find any casings or blood in the kitchen, but there were casings on the bed and floor in the bedroom along with two bullet fragments in the wall. Officer Turnmire stated that the casings belonged to "an assault rife, such as an SKS [Chinese Assault Rifle], or an AK-47." She discussed the location of the different casings and bullets, in addition to describing the location of furniture in the room. On cross-examination, Officer Turnmire testified that in addition to the victims' apartment, she also checked a neighboring apartment for bullets because shots were fired at it; however, she did not find any bullets in that apartment. When asked by the court, Officer Turnmire said she could not determine where the shooter was standing when he or she shot each bullet.

Officer William Woodard, an investigator with the Memphis Police Department, testified that in October 2003, he helped arrest the Defendant as a suspect in this case. Officer Woodard explained that the Defendant refused to waive his right to silence and his right to an attorney. Officer Woodard then testified about how an SKS Chinese Assault Rifle works, where "if you've got a cartridge in [the gun] and you just pull back . . . then you've got . . . Ten rounds as fast as you can pull the trigger." Additionally, the gun "shoots a 7.62 by 39 bullet, which is . . . an intermediate size cartridge, but it's a short range, or within 200 yards and it's pretty deadly." Moreover, he said a bullet shot from such an assault rifle would travel at about two thousand feet per second.

On November 5, 2003, after waiving his rights, the Defendant gave a statement to the Memphis police. Officer Connie Justice, one of the officers at the Memphis Police Department who took the Defendant's statement, read it to the jury. In his statement to the police, after he later waived his rights, the Defendant said he went to the apartment complex to buy marijuana from a man named "Stank." When the Defendant went into the apartment to inspect the marijuana, the four people in the room " 'put a pistol to [his] head . . . [and] laid [him] down on the floor.' " He claimed they robbed him of his $7400 and his handgun he kept in his pocket. He was eventually allowed to leave the apartment, at which point, he " 'got a 50 round [SKS] out of [his] trunk and ran back up to the door . . . [he] was looking for them.' " The Defendant admitted entering the rear of the apartment and shooting both of the men who robbed him. He stated that after shooting them, he left the scene. He also told the police that he sold the SKS Chinese Assault Rifle in Chicago about six months after he killed the victims and painted his Towncar gold two months after the incident.

Dr. O'Brian Cleary Smith, the doctor who performed the autopsies on the victims, testified that Larry Matthews tested negative for drugs and had a "minimal amount" of alcohol in his system.

4

Larry had an entrance wound from a bullet on his upper stomach, which exited through his lower back, and an exit wound near his groin area. He also had two entrance wounds on the back of his body. Dr. Smith explained each entry and exit wound and showed X-rays of the victim's torso and pelvic region, which depicted the bullet fragments in the body. Dr. Smith testified that he thought Larry was shot three times and that either "the shots going from the front of the abdomen out the lower back" or "the gunshot wound . . . higher up on the back of the right thigh that crossed over to the left buttock also went through the pelvis causing bleeding of the large blood vessel there" was the fatal shot.

Dr. Smith then testified about the autopsy of Rubin Matthews. Rubin tested negative for both alcohol and drugs. Rubin suffered a grazing wound from a bullet on his left arm, with the bullet traveling from his elbow down to his wrist. Rubin suffered another entrance wound on his left side and had an exit wound on the back of his right thigh. Rubin was also shot on the left side of his body and his upper middle thigh area. The shot to the left side of his body resulted in major abdominal surgery before his death. Dr. Smith then discussed Rubin's entrance and exit wounds on his lower left leg, followed by his addressing the exit wound on back of his left thigh. The fifth entry wound Dr. Smith discussed was in the abdomen, but, due to the surgical intervention, there was no exit wound. Dr. Smith testified that Rubin was shot five times and that he "died as a result of multiple high velocity gunshot wounds," with the shots to the abdomen and the thigh being fatal. On cross-examination, Dr. Smith listed the organ and internal damage done to both victims by the bullets.

Torrick Lyles testified, as a defense witness, that he was involved with a marijuana drug deal with the Defendant on August 11, 2002. Lyles said that he met the Defendant outside the apartment, and they walked inside together. Lyles said he "took [the Defendant's] gun off of him," and then one of the victims robbed the Defendant and went into the back of the apartment. Lyles stated that he knew the marijuana was fake when, at the deal, the Defendant asked to smell it and another person at the apartment put a gun to the Defendant's head. The Defendant then left the apartment with his hands raised. Lyles admitted shooting at the Defendant a total of six times, as the Defendant was getting into his car, "because [he] didn't feel safe," and then the Defendant shot back at them. Lyles said that he then went into another apartment to get a new shirt, and he saw "[the Defendant] . . . discharging his gun." Lyles said he next saw the Defendant leave the apartment complex in his car. He said that he went to the apartment where the Matthews brothers were, called 911, and stayed there until the ambulance arrived. On cross-examination, Lyles said one victim was "laying in the bedroom and the other brother was laying in the [apartment's] doorway." He also said the Matthews' apartment was a "drug house." Lyles admitted he is serving nearly thirty years in prison for a federal drug conviction. He said he was in the apartment's doorway when he fired five shots at the Defendant.

The jury found the Defendant guilty of two counts of first degree murder and the trial court sentenced him to two life sentences, to be served consecutively. It is from these convictions that the Defendant now appeals.

## II. Analysis

On appeal, the Defendant challenges the sufficiency of the evidence for both of his first degree murder convictions, and, tied with that claim, he argues that "the State failed to show that the killing . . . was without passion produced by adequate provocation." The State claims that the evidence sufficiently supports first degree murder.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). A conviction may be based entirely on circumstantial evidence where the facts are "so clearly interwoven and connected that the finger of guilt is pointed unerringly at the Defendant and the Defendant alone." *State v. Smith*, 868 S.W.2d 561, 569 (Tenn. 1993). The jury decides the weight to be given to circumstantial evidence, and "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citations omitted).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999); *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *Liakas*, 286 S.W.2d at 859. "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978); *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence.

6

*Goodwin*, 143 S.W.3d at 775 (citing *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

First degree murder is a premeditated and intentional killing of another. T.C.A. § 39-13-202(a)(1) (2006). The Tennessee Code Annotated fully defines premeditation:

> 'Premeditation' is an act done after the exercise of reflection and judgment. 'Premeditation' means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion to be capable of premeditation.

T.C.A. § 39-13-202 (d) (2006). Additionally, the Tennessee Supreme Court found the following circumstances sufficient for supporting a finding of premeditation: the use of a deadly weapon on an unarmed victim; the particular cruelty of a killing; the defendant's threats or declarations of intent to kill; the defendant's procurement of a weapon; any preparations to conceal the crime undertaken before the crime is committed; destruction or secretion of evidence of the killing; and a defendant's calmness after a killing. *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997). Furthermore, "evidence of repeated blows is relevant to establish premeditation, although this evidence alone is not sufficient to establish premeditation." *State v. Sims*, 45 S.W.3d 1, 8 (Tenn. 2001).

In the light most favorable to the State, the following facts, supporting the Defendant's conviction on two counts of first degree murder, were presented. The Defendant planned to buy $7400.00 worth of drugs from an unknown seller. In preparing for this drug deal, he packed an SKS Chinese Assault Rifle in his trunk, and he carried a concealed handgun in his pants pocket. He arrived at the apartment where the deal was planned to occur, and he went inside. After a few minutes, he left the apartment with his hands up in the air, walking towards his car without anyone walking behind him or shooting at him. He then went to the driver's side of his car, opened the door, pressed the button to release the trunk, walked around the side of the car, and retrieved the assault rifle. At that point, he went back into the apartment and shot two unarmed men with the assault rifle. The men were in the rear of the apartment, in their bedroom. The Defendant shot Larry three times, with two of the shots entering Larry's back. The Defendant shot Rubin, Larry's caretaker and brother, five times. The Defendant then fled the scene and called his girlfriend saying that he might have "hurt somebody." The Defendant remained missing for about a year, and he painted the car and sold the gun. We conclude that these facts are clearly sufficient to support his convictions for premeditated first degree murder.

Turning now to address the Defendant's claim that the State failed to prove that the killings were without passion produced by adequate provocation, and therefore were voluntary manslaughter,

we conclude that the State did not have to present proof specifically to negate voluntary manslaughter. The Defendant was charged with first degree, premeditated murder, not voluntary manslaughter. "If the state proves a premeditated and deliberate killing of another, meaning that the state has proven the absence of passion or provocation, then under [T.C.A.] § 39-13-202, the defendant should be adjudged guilty of first degree murder." T.C.A. § 39-13-211 (2006), Sentencing Comm'n Cmts. Premeditation is mutually exclusive with passion produced by adequate provocation. *See id.* Because we conclude that the State proved the Defendant committed first degree, premeditated murder, then it also proved that the killings were without passion produced by adequate provocation. The Defendant is not entitled to relief on this issue.

### III. Conclusion

We conclude that the Defendant's convictions were supported by sufficient evidence. Based on the foregoing reasoning and authorities, we affirm the judgments of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE

8